IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MONICA REYES, AS NEXT FRIEND
OF E.M.,[1]

        **Plaintiff,**

-vs-

MANOR INDEPENDENT SCHOOL
DISTRICT,
        **Defendant.**

CAUSE NO.:
A-14-CA-00469-SS

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the above-styled cause, and specifically Defendant Manor Independent School District's Motion for Judgment on the Administrative Record [#30], Plaintiff E.M.'s Response [#35] thereto, Defendant's Reply [#37] in support, and Plaintiff's Sur-Reply [#38] thereto, as well as Plaintiff's Motion for Summary Judgment [#31] and Defendant's Response [#36] thereto.[2] Having considered the documents, the case as a whole, and the governing law, the Court now enters the follow opinion and orders.

### Background

**I.**    **Facts**

Plaintiff E.M., represented by his mother and guardian Monica Reyes, was a former student at Manor Independent School District. Plaintiff filed this claim under the Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, alleging the

---

[1] At the time this lawsuit was filed, Plaintiff was an adult student who had been declared legally incompetent. His parent and guardian, Monica Reyes, initiated this lawsuit on Plaintiff's behalf. Although Plaintiff's counsel could not be bothered to redact Plaintiff's name from the pleadings, to ensure Plaintiff's privacy, the Court does so now. Entered simultaneously with this redacted order is a sealed order listing E.M.'s full name.

[2] Plaintiff also filed an Opposed Motion for Extension of Time to File Dispositive Motions [#32], which the Court hereby GRANTS.

1

District denied him a free appropriate public education (FAPE).[3] At the time of filing this complaint, Plaintiff has already transferred to another school district.

Plaintiff is eligible to receive special education under the IDEA as a student with severe intellectual disabilities and autism. Since moving from Mexico with his family in 2009, Plaintiff has attended schools in four different districts in the Austin area. Plaintiff began his tenure at the District—his third school district—in August of 2010. On August 18, 2010, Plaintiff turned 18.

Plaintiff has a history of maladaptive and self-injurious behaviors. For example, the second school district reported Plaintiff would repeatedly hit his head and bite his hand so severely he caused tissue damage. He would charge at adults and throw objects at them, sometimes pursuing an individual for over an hour when agitated. Both the first and second school districts conducted psychiatric evaluations of Plaintiff, which concluded his developmental age was between 27–32 months. Based on these assessments, the psychiatrist concluded Plaintiff was not capable of academic work and should instead focus on learning life skills and self-management. He also discouraged physical intervention to avoid escalating Plaintiff's aggressive behaviors and recommended the schools designate a separate space for Plaintiff to calm down. In light of these recommendations and in an attempt to manage Plaintiff's physical aggression, the second school district placed Plaintiff in a separate classroom with two adults and no access to his peers.

Soon after Plaintiff transferred to the District, the Admission, Review, and Dismissal Committee (ARDC) convened to review the previous school districts' individualized education program (IEP) and their evaluations of Plaintiff's progress. The ARDC reconvened on September 28, 2010 to develop an IEP for Plaintiff specific to his education in the District. The

---

[3] Citations to the five-volume administrative record will be as follows: AR [Volume Number] at [pincite].

ARDC adopted the second school district's Behavior Intervention Plan (BIP), which addressed Plaintiff's self-injurious behaviors and physical aggression towards others, tendency to leave assigned areas, and non-compliance with directions. The IEP as defined by the ARDC sought to maintain compliant behaviors, increase communication through use of symbols, gestures, pictures, or direction, classify and sort objects, improve self-help skills such as use of appropriate hygiene methods, and extinguish self-injurious behaviors. *See, e.g.*, AR II at 1403–13.

In December of 2010, the ARDC met again to discuss Plaintiff's aggressive behaviors and his parent's concerns. By that time, the District was frequently contacting Plaintiff's parent to pick him up from school. According to Plaintiff's teacher, he was physically aggressive toward staff members, roamed during class, failed to participate, displayed a short attention span, and would hit, pinch, grab, and twist the arms of adults without provocation. Plaintiff had also acted aggressively towards another student, and on at least one occasion injured staff members who thereafter had to seek emergency medical attention.

Around January of 2011, the District began consulting with a Board Certified Behavior Analyst (BCBA) from Spectrum Consulting, who completed a functional behavior assessment (FBA) of Plaintiff. The BCBA worked with staff members to implement alternative strategies to deescalate Plaintiff's behaviors, recommending that the staff implement the STAR curriculum, improve communication through the use of a picture exchange system, create clearly define boundaries and spaces, and increase life skills instruction and vocational skills training. She recommended restraints be limited to circumstances where it was necessary to protect others and prevent the destruction of property.

Throughout the 2010–11 and 2011–12 school years, Plaintiff continued to exhibit self-injurious behaviors and engage in significant aggression towards the staff and other students. On

3

at least one occasion Plaintiff engaged in as many as twenty acts of aggression throughout the day. During this same time period, the staff reported implementing as many as seventeen hug restraints and six ground restraints in one day. According to the staff, Plaintiff's behavior was unpredictable.

In January of 2012, the student separated his shoulder, apparently from pulling on a cabinet door. For the next two weeks, the student remained at home to promote the healing of his arm. He returned to school on February 29, 2012. Upon his return, the BCBA and two aides were to remain with Plaintiff at all times. The District also decided to separate Plaintiff from other students. While staff presence increased in Plaintiff's classroom from February 15, 2012 to May 30, 2012, there is conflicting evidence in the record as to whether Plaintiff's teacher was consistently present. *See, e.g.*, AR V at 6611, 6753, 6792.

In the spring of 2012, the BCBA and the District's aides recorded Plaintiff's behaviors every 5–15 minutes. They also recorded Plaintiff's progress in accomplishing tasks related to his IEP goals. The Special Education Hearing Officer (SEHO) found Plaintiff made some progress during this time period, but the progress was inconsistent and Plaintiff still required "hand over hand prompting for many tasks." AR I at 6.

The ARDC met twice in the spring of 2012: once on April 25, 2012 and again on May 30, 2012. The SEHO concluded Plaintiff's parent fully participated in both ARDC meetings with the help of an interpreter and advocate, and the "overall tone of both ARD Committee meetings [was] collaborative." AR I at 7. Following the meeting in May, however, Plaintiff's parent notified the District that Plaintiff would be transferring to a neighboring district, where he would attend a specialized school for severely impaired students. According to the SEHO, Plaintiff's

teacher at the fourth school district reported the frequency of Plaintiff's aggressive behaviors remained the same but the intensity diminished. *Id.*

## II.     Procedural History

On February 14, 2013, Plaintiff requested a due process hearing pursuant to 20 U.S.C. § 1415(b)(6). Plaintiff alleged a myriad of violations of the IDEA, including failing to keep Plaintiff safe from injuries, physically abusing Plaintiff, excessively restraining Plaintiff, and failing to provide appropriate educational services to meet Plaintiff's individualized needs. *See* AR I at 2–3.

Plaintiff's administrative complaint was originally assigned to SEHO Gwendolyn Webb. Webb determined the applicable statute of limitations period ran from February 15, 2012 to May 30, 2012, the date Plaintiff left the District. The case was later reassigned to SEHO Sharon Ramage, who did not reconsider Webb's prior rulings. An administrative hearing was held on October 23–25, 2013. On February 19, 2014, the SEHO issued her decision to the parties. She ultimately concluded the District had not denied Plaintiff a FAPE during the applicable limitations period.

On May 20, 2014, Plaintiff filed the instant complaint, alleging five procedural and substantive causes of action:

(1) The hearing officer erred in failing to toll the one-year statute of limitations pursuant to 20 U.S.C. § 1415(f)(3)(D) and TEX. CIV. PRAC. & REM. CODE § 16.001(b);

(2) The hearing officer erred in finding the District's failure to notify Plaintiff of the transfer of parental IDEA rights was harmless error;

(3) The hearing officer made critical errors in her findings of fact;

(4) The hearing officer erred in concluding compensatory relief was not available to Plaintiff; and

(5) The District violated § 504 of the Rehabilitation Act by intentionally discriminating against Plaintiff.

The District filed a motion for judgment on the administrative record, while Plaintiff moved for summary judgment on all of his claims except for those arising under § 504 of the Rehabilitation Act. The Court now turns to the substance of these motions.

## Analysis

### I.      Legal Standard

### A.      The IDEA

Because Texas receives federal education funding, all school districts within the state must comply with the IDEA. *See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997). Congress enacted the IDEA to ensure children with disabilities receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To achieve this goal, the IDEA requires states to educate children with disabilities "to the maximum extent appropriate . . . with children who are not disabled," and to do so "in the least restrictive environment consistent with [the child's] needs." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 (5th Cir.1993). A school district need not provide the best possible FAPE, "nor one that will maximize the child's educational potential." *Cypress-Fairbanks*, 118 F.3d at 247. Instead, "[t]he FAPE must be tailored to each disabled child's needs through an 'individualized education program,' which is a written statement prepared [by a committee composed of] a 'qualified' and 'knowledgeable' school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 925 (W.D. Tex.

2008) (citing 20 U.S.C. § 1414(d)(1)(B)). In Texas, the committee responsible for preparing a student's IEP is the Admissions, Review, and Dismissal Committee (ARDC).

Under the IDEA, any party aggrieved by the SEHO's findings and decision may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). Neither party has asked the Court to review evidence in addition to the administrative record. When no new evidence is presented to the district court in an IDEA suit, "the motion for summary judgment is simply the procedural vehicle for asking the Court to decide the case on the basis of the administrative record." *Austin Indep. Sch. Dist. v. Robert M.*, 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001); *see Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995) ("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . . the procedure is in substance an appeal from an administrative determination, not a summary judgment.").

"Under the IDEA, a federal district court's review of a state hearing officer's decision is virtually de novo. . . . The hearing officer's findings should be accorded due weight, but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). Thus, even though it is termed summary judgment, the existence of a disputed material fact will not defeat a summary judgment motion. *See* 20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA creates a presumption in favor of the school district's IEP. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). Accordingly, at the district court level, as at the administrative level, the party challenging the IEP bears the burden of showing the IEP was inappropriate under the IDEA. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 n.4 (5th Cir. 2009); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58

(2005) ("[T]he burden of persuasion [in an IDEA case] lies where it usually falls, upon the party seeking relief.").

## II.   Application

Before turning to the District's alleged procedural and substantive violations of the IDEA and Plaintiff's claim under § 504 of the Rehabilitation Act, the Court must first determine the applicable statute of limitations.

## A.   Statute of Limitations

The IDEA requires a parent to request an impartial due process hearing within two years of the date when the parent knew or should have known of the actions forming the basis of the complaint. 20 U.S.C. § 1415(f)(3)(c). However, § 1415(a) permits a shorter statute of limitations if the state has an explicit time limitation for requesting a hearing. *Id.* In Texas, the statute of limitation for requesting a due process hearing is one year. *See* 19 Tex. Admin. Code § 89.1151(c). Both state and federal regulations provide for two exceptions to the limitations period:

> [I]f the parent was prevented from filing a due process complaint due to:
>
> > (1) specific misrepresentations by the public education agency that it had resolved the problem forming the basis of the due process complaint; or
> >
> > (2) the public education agency's withholding of information from the parent that was required by 34 CFR § 300.1, *et seq.* to be provided to the parent.

*See* 19 Tex. Admin. Code § 89.1151(c); 34 C.F.R. § 300.511(f).

Plaintiff alleges the SEHO erred by failing to toll the statute of limitations pursuant to Tex. Civ. Prac. & Rem. Code § 16.001(a). Section 16.001 tolls the statute of limitation for bringing a lawsuit if the individual is under a legal disability when the cause of action accrues, either because the individual is younger than 18 years old or "of unsound mind." *See id.* It is an

established tenant of statutory construction that the legislature's enumeration of specific exceptions to a statute of limitations excludes all others by implication. *See* 51 AM. JUR. 2d *Limitation of Actions* § 46 (2015) ("Courts generally will not read an exception into a statute of limitations which has not been embodied in the statute, or engraft on a statute of limitations exceptions not contained in it."); *see also West v. Moore*, 116 S.W.3d 101, 105 (Tex. App.— Houston [14th Dist.] 2002, no pet.) (concluding the tolling provisions of § 16.001 were inapplicable to the two-year statute of limitations established under the Medical Liability and Insurance Improvement Act, because the Act expressly stated it applied "to all persons regardless of minority or other legal disability"). In this case, the Texas legislature enumerated two exceptions to the one-year statute of limitations it created for filing *due process hearings*, neither of which are related to the exceptions set forth under § 16.001 of the Texas Civil Practice and Remedies Code for *bringing a lawsuit*. As a result, the Court finds § 16.001 does not apply to toll the one-year statute of limitations for requesting a due process hearing.

Accordingly, to prevail on Plaintiff's statue-of-limitations claim, Plaintiff must show either that the District made specific misrepresentations or withheld information. In his pleadings, Plaintiff simply argued the latter: that the statute of limitations should be tolled under § 1415(f)(3)(D)(ii) because the District withheld information from him. Specifically, Plaintiff alleges the District failed to notify him that his IDEA rights were transferred to him when he turned 18 years old. *See* Am. Compl. [#8] ¶ 20; *see also* 34 C.F.R. § 300.520(a)(3) ("Whenever a State provides for the transfer of rights . . . , the agency must notify the child and the parents of the transfer of rights."); 19 TEX. ADMIN. CODE § 89.1049(a) ("After the student reaches the age of 18, . . . the school district shall provide any notice required under IDEA . . . to both the adult student and the parent.").

The failure to properly notify and permit the participation of required ARDC members may constitute a withholding of information, which in turn may prevent the plaintiff or his parents from filing a timely request for a due process hearing. *See, e.g., P., S.H. ex rel. A.H. v. Plano Indep. School Dist.*, 487 F. App'x 850, 863 (5th Cir. 2012). In *Plano Indep. Sch. Dist.*, the Fifth Circuit held Texas's one-year statute of limitations was inapplicable to the plaintiff's claims, because the ARDC was "not duly constituted and was missing a statutorily-required member[,]" namely the plaintiff's regular education teacher. *Id.* at 865. Had the regular education teacher not been missing, the court concluded, the resulting deficiencies in the IEP would have been made clear to the plaintiff's parents sooner. *Id.* at 863.

Unlike *Plano*, where the plaintiff's parents were uninformed about the resulting deficiencies, it is undisputed that the District provided Plaintiff's parents with notice of the transfer of IDEA rights. Moreover, from the beginning of Plaintiff's time in the District, the District negotiated with Plaintiff's parent and permitted her to meaningfully participate in the ARDC meetings. Plaintiff has not shown that his presence at the ARDC meetings would have been appropriate, given his inability to meaningfully participate in the discussions. *See infra* section II.B.i. Accordingly, the Court finds no information was withheld from the parent which was required to be provided to the parent by 34 CFR § 300.1 *et seq.*, and therefore the exception to the one-year statute of limitation set forth under 34 CFR § 300.511(f)(3)(D)(ii) is inapplicable.[4] Accordingly, the applicable one-year limitations period begins on February 15,

---

[4] Plaintiff further argues the statute of limitations should be tolled because once Plaintiff turned 18 years old and his parents' rights under the IDEA were transferred to him, no one had standing to bring a suit on his behalf. Plaintiff had not been declared legally incompetent, his parents had not yet obtained guardianship, and he could not execute a valid power of attorney transferring his IDEA rights to his parents pursuant to 19 TEX. ADMIN. CODE § 89.1049(e). The narrow tolling exceptions set forth under § 89.1141(c) do not permit a court to toll the statute of limitations for an adult student who is incompetent and without a guardian. However much sympathy the Court has for a plaintiff in this position, it is diminished by the circumstances of the present case. Plaintiff's parent—who filed the request for the due process hearing and fully participated in the administrative proceeding—now argues she was

2012, one year prior to the day Plaintiff requested a due process hearing on February 14, 2013. Because Plaintiff moved to a fourth school district on May 30, 2012, this Court will only consider events which occurred from February 15, 2012 to May 30, 2012. The ultimate issue, then, is whether the District denied Plaintiff a FAPE from February 15, 2012 to May 30, 2012.

**B.    Denial of a FAPE**

A district court's review of the SEHO's decision is twofold: the court must (1) determine whether the school district complied with the IDEA's procedural requirements, and (2) then determine if the student's IEP is reasonably calculated to provide meaningful educational benefits. *Rowley*, 458 U.S. at 177. In this case, Plaintiff asserts the District denied him a FAPE by violating both the procedural safeguards and substantive provisions of the IDEA.

**i.    Procedural Violations**

Plaintiff first alleges the SEHO erred in finding the District's alleged procedural violations did not result in the denial of a FAPE. Although Plaintiff's pleadings are replete with contradictory claims,[5] the Court construes the complaint as asserting two procedural violations of the IDEA which resulted in the denial of a FAPE: (1) the District's categorical exclusion of Plaintiff from the ARDC meetings due to Plaintiff's "level of cognitive functioning," and (2) the District's failure to notify Plaintiff that his rights under the IDEA transferred to him when he reached the age of majority.[6] AR II at 1281. Procedural violations support finding the denial of a

---

not authorized to file the request on Plaintiff's behalf in the first place. The Court is not inclined to give Plaintiff's parent two bites of the apple simply because she is dissatisfied with the SEHO's decision.

[5] For instance, Plaintiff claims the District *never* notified his parent that Plaintiff's IDEA rights were transferred once he reached the age of 18, but simultaneously admits the District notified Plaintiff's mother of the transfer of IDEA rights on May 5, 2011. Pl.'s Mot. Summ. J. [#31] at 12.

[6] At the administrative hearing, Plaintiff also complained that (1) the District failed to provide Plaintiff's parent with an interpreter during the ARDC meetings, and (2) the District failed to provide Plaintiff copies of his educational records in Spanish despite a purported agreement to do so. AR I at 9–10. The SEHO concluded these procedural violations did not result in the denial of a FAPE. *Id.* This Court does not address these alleged procedural

FAPE only when the error impedes the student's right to a FAPE, significantly impairs the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE, or deprives the student of an educational benefit. 34 C.F.R. § 300.513(a)(2).

The District's exclusion of Plaintiff from the ARDC meetings does not constitute a procedural violation of the IDEA. *See Plano Indep. Sch. Dist.*, 487 F. App'x at 865 (noting the student's absence from the ARDC meeting, but concluding the composition of the ARDC was procedurally defective simply because the student's regular education teacher was absent). Section 1414(d)(1)(B) states the student should be included in the ARDC "whenever appropriate." 20 U.S.C. § 1414(d)(1)(B)(vii). As the SEHO noted, it is clear from the record that Plaintiff "did not have the capacity to meaningfully participate in the ARD Committee meetings." AR I at 10. "[I]f the child does not attend the IEP Team meeting, the public agency must take other steps to ensure the child's preferences and interests are considered." 34 C.F.R. § 300.321(b)( 2). The District did just that, by ensuring Plaintiff's parent was present and actively participating in the ARDC meetings with the aid of an advocate and an interpreter. Moreover, even assuming Plaintiff's exclusion from the meetings constituted a procedural violation, Plaintiff has not shown how his presence at the ARDC meetings would have altered the resulting IEP or how his absence impeded his right to a FAPE. Accordingly, the District did not deny Plaintiff a FAPE by excluding him from the ARDC meetings.

The District's failure to provide Plaintiff with notice of the transfer of his IDEA rights falls outside of the applicable statute of limitations. Nevertheless, even considering the merits of this claim and assuming the failure to provide notice resulted in a procedural violation of the

---

violations because Plaintiff has not sought judicial review of the SEHO's decision on these claims. Plaintiff now concedes an interpreter was provided for Plaintiff at the ARDC meetings, but argues the procedural safeguards of the IDEA were nevertheless violated because Disabilities Rights Texas—instead of the District—hired the interpreter. Pl.'s Resp. [#35] at 11. However, Plaintiff's argument elevates form over substance and fails to show how this alleged violation deprived Plaintiff of an appropriate education.

IDEA, it did not result in the denial of a FAPE. Texas law provides for the transfer of parental rights to the student when the student turns 18 years old and requires the school district to notify in writing the adult student and parent of the transfer of parental rights. *See* 19 TEX. ADMIN. CODE. § 89.1049(a). However, the IDEA expressly provides that parental rights do not transfer to students who have been determined incompetent under state law when they reach the age of majority. *See* 20 U.S.C. § 1415(m)(1); 34 C.F.R. § 300.520(a). Even where a student has not been deemed incompetent, if that child does not have the ability to provide informed consent with respect to his educational program, there must be state-established procedures for appointing the parent of the student to represent the student's educational interests when the student reaches the age of majority. *See* 20 U.S.C. § 1415(m)(2); 34 C.F.R. § 300.520(b). Plaintiff admits there is no established procedure in Texas for determining a student's lesser competency. *See* Pl.'s Resp. [#35] at 2 n.1.

In this case, the rights accorded to Plaintiff's parents under the IDEA transferred to Plaintiff when he turned 18 years old because Plaintiff had not yet been declared incompetent, was incapable of executing a valid Power of Attorney, and there were no state-established procedures for appointing his parent to represent his educational interests. Accordingly, the District's failure to notify Plaintiff of the transfer of parental rights was in error. Nevertheless, it is clear Plaintiff was otherwise incapable of providing informed consent with respect to his educational interests, even if he had not yet been declared incompetent. Indeed, his parents established his incompetency by obtaining guardianship on April 18, 2013. Am. Compl. [#8-2] Ex. 2 (Guardianship). After the parental rights transferred but while Plaintiff's parents were pursuing guardianship, Plaintiff's parent continued to represent Plaintiff's interests as his de facto guardian at the ARDC meetings until Plaintiff left the District. The result would surely

have been the same had Plaintiff been handed a written notification of the transfer of his rights or had guardianship been obtained: Plaintiff's parent—with the aid of an advocate and translator— would have continued to represent Plaintiff's educational interests given Plaintiff's inability to do so himself. Given the active participation of Plaintiff's parent in crafting his IEP and the absence of any demonstrable lost educational opportunity, Plaintiff has failed to establish that the District's procedural violation produced substantive harm which ultimately deprived Plaintiff of a FAPE.

### ii.       Substantive Violations

Plaintiff next challenges the SEHO's decision that the District's IEP was substantively effective. Plaintiff alleges the SEHO made a myriad of erroneous factual findings, including the SEHO's finding that a BCBA and two aides remained with the student at all times, the District provided notice to the student of the transfer of his IDEA rights in May of 2011, the BCBA continued to observe the student and assist in tracking data to analyze the student's behavior in the beginning of the 2011–12 school year, Plaintiff's parent would not permit the District to administer medication while at school, and the parent or her advocate—rather than the District— decided to maintain the student at home for two weeks to avoid further injury to his shoulder. Many of Plaintiff's allegations involve conduct which occurred outside the limitations period. As for the alleged violations which occurred during the limitations period, the Court must determine whether Plaintiff's IEP was "reasonably calculated to enable the child to receive educational benefits," considering whether (1) the program was individualized on the basis of the student's assessments and performance, (2) the program was administered in the least restrictive environment, (3) the services were provided in a cooperative and collaborative manner, and (4) positive academic and nonacademic benefits were demonstrated. *Michael F.*, 118 F.3d at 253;

*see also Michael Z.*, 580 F.3d at 292 n.4 (concluding these factors should be weighed on a case-by-case basis).

### a.  Individualized Program

The IDEA does not require a school district to correct a student's behavioral problems. *L.F. v. Hous. Indep. Sch. Dist.*, No. Civ. A H-08-2415, 2009 WL 3073926, at *18 (S.D. Tex. Sept. 21, 2009). Instead, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i).

In this case, the record reveals the District took steps to address Plaintiff's maladaptive behaviors and implement positive behavioral interventions to address them. In Plaintiff's first year at the District, the District began consulting with behavioral specialists at Spectrum Consulting. The BCBA continued to observe Plaintiff and assist staff members in collecting data to analyze Plaintiff's behavior during the 2011–12 school year. The BCBA reported that after Plaintiff's return from an in-patient treatment at the Austin State Hospital at the beginning of the 2011–12 school year, his behaviors became unpredictable and previously effective interventions no longer worked. *See, e.g.*, AR V at 6739. Because Plaintiff's behavior had become unpredictable since the original BIP was developed, the ARDC modified the behavioral goals to reflect Plaintiff's present performance—focusing first on decreasing Plaintiff's aggression and then on achieving the IEP's goals. AR V at 6739, 6753. To increase staff presence and promote positive behavioral interventions in the spring of 2012, the BCBA and two aides were to remain with Plaintiff at all times. *See* AR V at 6758–60.

Plaintiff faults the District because "[n]one of [Plaintiff's] goals have been mastered despite the fact that many had been implemented since 9/28/2010." Pl.'s Mot. Summ. J. [#31] at

17. However, no school district can guarantee the success of an IEP. "Simply because another plan might have worked as well or even better does not mean that the student did not receive a FAPE." *D.B. ex rel. C.B. v. Hous. Indep. Sch. Dist.*, No. CIV.A. H-06-354, 2007 WL 2947443, at *10 (S.D. Tex. Sept. 29, 2007). The record indicates the IEP was sufficiently individualized to address Plaintiff's unique and challenging needs.

### b. Least Restrictive Environment

The IDEA requires every student with a disability to be educated in the least restrictive environment necessary to meet his needs. 20 U.S.C. § 1421(a)(5)(B). A least restrictive environment is defined as "not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993). Although there is a presumption in favor of mainstreaming a child, this presumption may be overcome when a regular classroom will not meet the disabled child's needs. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989) (recognizing that due to the nature and severity of some children's disabilities, special education is necessary and "mainstreaming does not provide an education designed to meet their unique needs"). Indeed, § 300.114 further provides that "if the nature or severity of [a child's] disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily," then the child may be removed from the regular educational environment. 34 C.F.R. § 300.114(a)(2)(ii).

Plaintiff claims he was not educated in the least restrictive environment possible because he was educated in a classroom by himself, isolated from his peers, and the doors leading into the classroom from both the hallway and another life skills classroom were locked. Determining whether a student is educated in the least restrictive environment is necessarily a fact-intensive

inquiry. *See Daniel R.R.*, 874 F.2d at 1044. In this case, previous psychiatric evaluations of Plaintiff determined he was not capable of academic work at any level. Thus, Plaintiff would not have received an academic benefit from a regular education, and any non-academic benefit he received from interacting with his non-handicapped peers would have been marginal. *See id.* at 1051 (concluding the student would not receive any academic benefit and only marginal non-academic benefits from a mainstream education). Moreover, the record indicates that educating Plaintiff in a separate classroom removed from similarly-situated peers was necessary because his aggressive behaviors threatened others and impeded his own learning. Furthermore, the BCBA testified the door was not locked every day, and when it was locked, it was simply to prevent Plaintiff from trying to escape, which she testified occurred weekly. AR V at 6801–02.

Plaintiff also faults the District for engaging in excessive restraints.[7] The BCBA testified restraints were only used to prevent injury or the destruction of valuable property. AR V at 6805. Similarly, Plaintiff's teacher testified Plaintiff was never restrained as a form of discipline or in any non-emergency situation. AR V at 6619–20. The need for restraints was highest at the beginning of the 2011–2012 school year, but diminished in the spring of 2012. *See* AR III at 2907–22. Without more evidence that the District excessively used restraints during the limitations period, the Court cannot conclude Plaintiff was denied a FAPE.

### c.   Collaborative Services

To establish the educational program was not provided in coordination with the key "stakeholders," a plaintiff must "show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F.3d at 349. The

---

[7] Many of the examples of excessive physical restraints listed in Plaintiff's summary judgment motion occurred in December of 2010, outside the applicable limitations period. *See* Pl.'s Mot. Summ. J. [#31] at 27, 30.

record reveals the key stakeholders provided Plaintiff services in a coordinated and collaborated manner: the District coordinated with an outside consulting agency to hire a BCBA to remain with Plaintiff at all times from February of 2012 to May of 2012; the BCBA testified she regularly consulted with an occupational therapist to better understand Plaintiff's "sensory needs"; the BCBA provided Plaintiff's aides with training specifically tailored to Plaintiff's unique behavioral challenges; staff members received training on proper data collection; and Plaintiff's teacher was trained in addressing autism issues and conducting SAMA restraints when necessary.

During the four-month limitations period, the committee met on April 25, 2012 and again on May 30, 2012. The SEHO concluded Plaintiff's parent—with the help of an advocate and an interpreter—meaningfully participated in the ARDC meetings, and Plaintiff has not challenged that finding in this Court. *See* AR I at 8–9. At each meeting, the ARDC continued to develop and modify the IEP's goals in light of Plaintiff's persistent aggression and subsequently slow progress. The record indicates Plaintiff's parent agreed to all or substantially all of the IEP provisions suggested by the ARDC. Accordingly, the Court finds Plaintiff's IEP was provided in coordination with the key stakeholders.

### d. Positive Academic and Nonacademic Benefits

The gravamen of Plaintiff's final complaint is that he was denied educational benefits because (1) his teacher was not directly involved in his education, (2) he was absent from school for two weeks following a shoulder injury, and (3) he has either regressed or made no progress during his time at the District.

Plaintiff first claims the evidence in the record clearly indicates his teacher was not directly involved in his education.[8] The BCBA testified to the contrary, however, indicating Plaintiff's teacher was present "several times a day." AR V at 6753, 6792. Even assuming Plaintiff's teacher was not directly involved, it is undisputed that the BCBA and two aides worked with Plaintiff to manage his aggression and achieve his IEP goals. Plaintiff's only challenge to this finding is that a BCBA and two aides did not remain with Plaintiff at all times prior to February 15, 2012. *See* Pl.'s Mot. Summ. J. [#31] at 16. However, this accusation is outside the limitations period, and therefore irrelevant to the Court's consideration of whether Plaintiff was denied educational benefits.

Plaintiff next argues that during the two-week period when he was absent from school, he did not receive an educational benefit. The Court agrees. Nevertheless, regardless of whether the District initially recommended that Plaintiff remain at home after he injured his shoulder, as Plaintiff suggests, it is clear from the record that all parties involved were concerned about the possibility of further injury to Plaintiff's shoulder. Given Plaintiff's tendency to injure himself and act aggressively towards others, the District's concern that it would be unable to ensure Plaintiff's safety in a vulnerable state was justified.

Finally, Plaintiff claims he failed to make any measurable progress while attending the District, and when "[c]ompared with the skills he had when he attended Whitehouse ISD, [Plaintiff] has [either] regressed or made no progress." Pl.'s Mot. Summ. J. [#31] at 23. Specifically, Plaintiff points to his inconsistent ability to indicate "yes" or "no" on an iPad, point to objects, or communicate through pictures. Moreover, at his previous school, Plaintiff purportedly was able to complete puzzles, communicate through picture cards, and use the

---

[8] Plaintiff also accuses the District of failing to properly train his previous teacher, Mr. Robey. Plaintiff admits, however, that Mr. Robey only taught during the 2010–11 school year and did not return for the 2011–12 school year. Pl.'s Mot. Summ. J. [#31] at 27.

restroom independently, none of which Plaintiff could independently accomplish while attending Manor High School. *Id.* at 23–24.

The record indicates Plaintiff's aggressive and self-injurious behaviors became unpredictable during the 2011–12 school year. Indeed, the BCBA testified that the District's priority was to first reduce Plaintiff's aggressive behaviors so Plaintiff could focus on achieving the IEP's goals. AR V at 6720. In an effort to recognize the precursors to Plaintiff's aggressive behaviors, the staff monitored and recorded Plaintiff's behavior every 5–15 minutes. AR V at 6758–60. While the need for restraints did not diminish from February of 2012 to May of 2012, the District nevertheless encouraged Plaintiff to achieve the IEP's goals. For example, during the spring of 2012, the District introduced an iPad into Plaintiff's daily routine and attempted to teach Plaintiff to say "yes" or "no" to reflect his desires; Plaintiff began to tolerate the sound of an electronic razer near his face; and on occasion Plaintiff would fold towels of different sizes. AR V at 6770–80. The testimony from Plaintiff's teacher, an aide, and the BCBA indicated that although Plaintiff's progress was slow and at times inconsistent, it was progress nonetheless. AR V at 6606–07, 6611–19, 6638–39, 6646–48, 6764–65. At the hearing, the SEHO heard these testimonies, and based on the witnesses' credibility, concluded Plaintiff began to make progress during the spring of 2012. AR I at 16. Plaintiff, as the party challenging the District's implementation of the IEP, must show more than a *de minimis* failure to implement all elements of the IEP. *Bobby R.*, 200 F.3d at 349. He must demonstrate the District failed "to implement substantial or significant provisions of the IEP." *Id.* Given the evidence in the record which suggests Plaintiff made some progress during the limitations period despite his unpredictable, aggressive behavior, the Court finds Plaintiff has failed to prove he was denied positive academic and nonacademic benefits. The balance of the *Michael F.* factors thus indicates the

District's IEP was reasonably calculated to enable Plaintiff to receive educational benefits. In the absence of a violation of Plaintiff's right to an appropriate education, Plaintiff's request for injunctive relief in the form of compensatory education is denied.

## C.      Rehabilitation Act

In the parties' cross-motions for summary judgment, only the District has moved for summary judgment on Plaintiff's claim for relief under the Rehabilitation Act. Plaintiff alleges the District violated § 504 of the Rehabilitation Act by using excessive restraints, taking pictures of Plaintiff disrobing, and making changes in the classroom that were followed by new maladaptive behaviors. Am. Compl. [#8] at 21–23. Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a). The Fifth Circuit has explained that "while IDEA imposes an affirmative obligation on states to assure disabled children a free appropriate public education," §504 of the Rehabilitation Act "broadly prohibit[s] discrimination against disabled persons in federally assisted programs or activities." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010).

The IDEA does not "restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(l). However, "before filing a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter." *Id.* In other words, while the IDEA permits parents and students to seek relief under other statutes,

such as the Rehabilitation Act, it requires complainants to first exhaust their administrative remedies with respect to these claims. *Hous. Indep. Sch. Dist.*, 2009 WL 3073926, at \*22 ("Before bringing a claim for relief under the Rehabilitation Act based on allegations that overlap with the IDEA, a plaintiff must exhaust administrative remedies with the state education agency.").

Plaintiff's claim under § 504 of the Rehabilitation Act is based on the same factual allegations as the claims he asserted under the IDEA, namely that the District used excessive restraints, took inappropriate photos of Plaintiff disrobing, and failed to manage Plaintiff's maladaptive behaviors. Because Plaintiff's § 504 claim is based on overlapping allegations, Plaintiff was required to first exhaust his administrative remedies by alleging a violation of the Rehabilitation Act before the SEHO. Plaintiff failed to do so, and as a result, the District's motion for summary judgment on this claim must be granted.[9]

### Conclusion

While the Court commends Plaintiff's mother for her tenacious advocacy on her son's behalf, the Court cannot ignore the simple reality that the State of Texas is unable to provide every child with a perfect education. In this case, the District's educational plan may not have been perfect, but it was sufficiently tailored to meet Plaintiff's unique and challenging needs.

Accordingly,

IT IS ORDERED that Defendant Manor Independent School District's Motion for Judgment on the Administrative Record [#30] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff E.M.'s Motion for Summary Judgment [#31] is DENIED;

---

[9] In the alternative, the Court finds Plaintiff's claim for relief under the Rehabilitation Act fails on the merits.

IT IS FINALLY ORDERED that Plaintiff E.M.'s Opposed Motion for Extension of Time to File Dispositive Motions [#32] is GRANTED.

SIGNED this the 2ᵗʰ day of February 2016.

SAM SPARKS
UNITED STATES DISTRICT JUDGE